655 S.E.2d 680 (2007)
In the Interest of T.B., a child.
No. A07A1772.
Court of Appeals of Georgia.
December 7, 2007.
Lisa Lott, Thomas J. Killeen, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Kathryn A. Fox, Assistant Attorney General, Bailey & Riley, Nadine D. Bailey, Randall H. Forester, for appellee.
SMITH, Presiding Judge.
The juvenile court terminated the natural mother's rights to her 20-month-old son, T.B. The mother appeals, asserting that the trial court erred in finding that termination was in the best interest of the child.[1] For reasons that follow, we affirm.
On appeal from an order terminating parental rights, we construe the evidence in a light favorable to the juvenile court's ruling and determine whether "`any rational trier of fact could have found by clear and convincing evidence that the biological parent's *681 rights to custody have been lost.'" In the Interest of A.C., 272 Ga.App. 165, 166, 611 S.E.2d 766 (2005). Viewed in this manner, the evidence showed that T.B. was born on June 21, 2004. Just four months later, the juvenile court entered a shelter care order for T.B. and his two older siblings after determining that the children lacked supervision and had been subjected to domestic violence between the mother and T.B.'s father.
At some point over the next months, the mother assaulted her own father, and she was incarcerated in January 2005 as a result. The juvenile court subsequently found T.B. and his siblings deprived based upon the mother's incarceration, lack of housing, lack of income, substance abuse, and the instances of domestic violence in her home. Through that same order, the juvenile court adopted the reunification case plan developed by the Department of Family and Children Services (DFACS), which required the mother to, among other things, remain drug and alcohol free, demonstrate an ability to care for and supervise T.B., and attend scheduled visits with the child.
In October 2005, however, the juvenile court ended reunification services and approved a plan to place T.B. for adoption. DFACS petitioned to terminate the mother's parental rights to T.B. later that month. When the juvenile court held the termination hearing in February 2006, the mother was still in prison with a maximum release date of February 2008.
The evidence presented at the hearing showed that the mother was arrested before her case plan was prepared. Prior to that arrest, however, the DFACS caseworker assigned to the case asked the mother to submit to several drug screens, but the mother refused. The caseworker also established a schedule for the mother to visit with T.B. Although the mother attended some of the pre-arrest visits, she missed several others.
The mother testified that she did not attend school beyond the ninth grade, had never worked, and had no specific plans for income or employment after her release from prison. She believed, however, that her father would "help" her financially. She further claimed that she would live with her niece if she regained custody of T.B., although she had not been to her niece's house and did not know its size. The mother admitted abusing alcohol after her children were removed in October 2004, but denied that she had an alcohol problem before that time. She also testified that she had attended Alcoholics Anonymous meetings in prison and would avoid alcohol in order to regain custody of her son.
A psychologist who evaluated the mother asserted that T.B. would be at risk of harm if returned to the mother. The psychologist noted that the mother had a lengthy history of untreated alcohol dependence, suffered from poor impulse control, and had been involved in physical altercations with those close to her. During the evaluation, the mother reported a "substantial history of drinking" beginning when she was 17 years old, as well as significant DFACS involvement with her two older children, who had lived with a variety of relatives and friends. The mother had never worked or supported herself independently, and her "intellectual functioning [was] in the mild mental retardation range." Moreover, although the mother expressed a desire to resolve her substance abuse issues and change her life, the results of the evaluation indicated that she might have difficulty changing.
A social service therapist also assessed the family and the mother's ability to meet T.B.'s needs. The mother told the therapist that she had struggled with substance abuse in the past, but was "clean" at the time of the assessment, which was conducted during a period when, according to the mother's own testimony, she was drinking heavily. The therapist testified that the mother's past behavior had impacted T.B. negatively, and she had concerns about the mother's ability to parent in the future. According to the therapist, T.B. needed permanency and stability in his home life. Based on the assessment, the therapist concluded that the mother's parental rights should be terminated.
The evidence further showed that, on the date of the hearing, T.B. had been living for approximately three months with a "foster to *682 adopt" family. The foster father testified that the family was attached to T.B. and wished to adopt him.
The guardian ad litem recommended that the mother's parental rights be terminated and that T.B. be placed for adoption. From her investigation, the guardian found that T.B. had been in foster care virtually his entire life, had not developed an attachment to his mother, and was bonded with his present foster parents. Expressing concern about "foster care drift," the guardian asserted that a permanency plan of adoption was in T.B.'s best interest.
Before terminating parental rights, the juvenile court must engage in a two-step analysis:
The first step requires a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is the cause of the deprivation; (3) such cause of deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors are satisfied, the court must then determine whether termination of parental rights is in the child's best interest, considering physical, mental, emotional, and moral condition and needs, including the need for a secure and stable home.
In the Interest of A.C., supra, 272 Ga.App. at 166, 611 S.E.2d 766.
On appeal, the mother does not question the juvenile court's finding as to parental misconduct or inability. She focuses instead on the best interest of the child, asserting that, despite her parental misconduct and inability, termination would not be in T.B.'s best interest. To support this claim, the mother argues that (1) her psychological evaluators found that she had various strengths; (2) her incarceration prevented her from completing her case plan; and (3) T.B. could live with his paternal grandmother pending her release from prison. According to the mother, these factors require reversal of the termination order.
We disagree. The psychologist and therapist who evaluated the mother noted that she exhibited certain strengths during her assessments, particularly that she loved T.B., wanted to cooperate with DFACS, and sought to remedy her substance abuse problem and lead a stable lifestyle. But both expressed concerns about the mother's ability to parent T.B., and the psychologist testified that T.B. was at risk of harm if returned to his mother. The psychologist also questioned the mother's ability to change her life, and the therapist recommended that her parental rights be terminated.
We recognize that the mother's incarceration may have prevented her from meeting all case plan goals. But the mother has not challenged the juvenile court's parental misconduct and inability finding, which necessarily included a determination that her behavior caused T.B.'s deprivation, that the behavior will likely continue, and that it will harm T.B. in the future.
Furthermore, the evidence demonstrated that the mother had been incarcerated for all but seven months of T.B.'s life, missed several scheduled visits with T.B. before her incarceration, had no bond with her child, lacked stability, and had a lengthy history with DFACS involving her older children. The evidence also supported a finding that the mother, who provided conflicting information to the court and her evaluators regarding her substance abuse history, suffered significantly from that abuse and will have difficulty changing her behavior. In contrast, at the time of the hearing, T.B. resided in a stable foster home with a family who loved him and wished to adopt him.
Given the evidence presented, the juvenile court was authorized to conclude that termination of the mother's parental rights would serve T.B.'s best interest. See In the Interest of R.D.B., 282 Ga.App. 628, 633(2), 639 S.E.2d 565 (2006); In the Interest of A.C., supra, 272 Ga.App. at 168(2), 611 S.E.2d 766. Although the mother now contends that possible relative placement with T.B.'s paternal grandmother precluded termination, she has cited no authority for this contention, and we have found none. Moreover, the DFACS caseworker testified that, following a termination *683 order, permanent adoptive placement in the grandmother's home would be considered pursuant to OCGA § 15-11-103(a)(1).
The juvenile court properly found that termination of the mother's parental rights is in the best interest of T.B. Accordingly, we affirm.
Judgment affirmed.
BARNES, C.J., and MILLER, J., concur.
NOTES
[1] The juvenile court also terminated the father's parental rights to T.B., but the father is not a party to this appeal.